*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

*In re* DAVID PETER JANKOWSKI, D.O.

|  |  |
|---|---|
| DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS, | UNPUBLISHED<br>November 19, 2020 |
| Petitioner-Appellee, | |
| V | No.  348760<br>LARA Bureau of Professional<br>Licensing, Board of Osteopathic<br>Medicine and Surgery<br>Disciplinary Subcommittee |
| DAVID PETER JANKOWSKI, D.O., | LC No.  17-013679 |
| Respondent-Appellant. | |

Before: MARKEY, P.J., and METER and GADOLA, JJ.

PER CURIAM.

Respondent appeals as of right a final order, issued by the Board of Osteopathic and Surgical Medicine Disciplinary Subcommittee, a Board operating under the Michigan Department of Licensing and Regulatory Affairs (LARA) Bureau of Professional Licensing. The Disciplinary Subcommittee concluded that respondent violated MCL 333.16221(a) (negligence or failure to exercise due care), MCL 333.16221(b)(*i*) (incompetence), MCL 333.16221(b)(*vi*) (lack of good moral character), and MCL 333.16221(c)(*iv*) (prescribing or administering drugs for other than lawful diagnostic or therapeutic purposes), all of which are provisions of the Public Health Code, MCL 333.1101 *et seq*., fined respondent $25,000, and suspended his license to practice medicine for three years.  We affirm.

## I.     BACKGROUND

In June 2017, the Bureau of Professional Licensing filed an administrative complaint against respondent, a licensed osteopathic physician.  The complaint alleged that respondent's

-1-

prescribing practices, patient treatments, and documentation practices violated the Public Health Code. More specifically, the four-count complaint indicated that the Michigan Automated Prescription System (MAPS), a database that's used to track controlled substances, reflected that from January 1, 2015 through June 19, 2017, respondent wrote 23,906 controlled-substance prescriptions, more than 70% of which were for certain commonly abused and diverted controlled substances, and he dispensed nearly 21% of the prescriptions he wrote in 2016 and nearly 17% in 2017. The complaint further outlined observations made following the review of records regarding respondent's care of nine specific patients during the same timeframe, and alleged that defendant had committed the violations outlined above.

Several witnesses testified at hearings held between August 2017 and August 2018. Pharmacy specialist investigator Janice Waldmiller, who was involved in the investigation into respondent's prescribing practices, testified that of the over 50,000 prescribers in Michigan, respondent was the 73rd highest prescriber of all controlled substances in 2015 and was 58th in 2016. Waldmiller further testified that "highly abused and diverted medications," including oxymorphone, OxyContin, oxycodone-acetaminophen, alprazolam, Clonazepam, Hydrocodone, Percocet, and Norco, comprised over 75% of respondent's overall controlled substance prescribing in 2015 and over 71% in 2016 through August 25. Waldmiller also noted instances of patients receiving controlled substances from multiple physicians, the amount of medications prescribed, and drug screen results that were inconsistent with medications the patients received from pharmacies. Waldmiller explained that these practices were inconsistent with "the CDC guidelines [that] indicated that less than 15 morphine equivalent dosing was appropriate. But anything greater than 90 morphine equivalent dosing, the practitioner should weigh . . . the risks and benefits . . . because that's where we get into potential overdose due to respiratory depression." Waldmiller also noted that the number of prescriptions respondent wrote for abused and diverted drugs decreased after an investigation was started.

David Aaron Cooke, M.D., was certified by the American Board of Internal Medicine and spent "approximately two-thirds of [his] time in general internal medicine primary care practice and approximately one-third of [his] time in specialty pain management care through the University of Michigan Anesthesia Back and Pain Center." He acknowledged that he was not a member of the American Pain Society or the American Academy of Pain Medicine, and he did not practice interventional pain medicine. Dr. Cooke indicated that the 2016 CDC Guideline for Prescribing Opioids for Chronic Pain (CDC Guidelines) was "currently the most authoritative statement" in regard to a standard of care for prescribing controlled substances in Michigan for the period at issue. He explained that the CDC was not the first organization to make the recommendations, but the most recent, that the CDC Guidelines memorialized what had been the standard of care for prescribing controlled substances for at least the previous five years, and that the principles underlying the CDC Guidelines had also been previously published in leading medical journals. He suggested that the CDC Guidelines were voluntary rather than prescriptive standards based on emerging evidence, and recognized that they stated that they were intended for primary care physicians treating patients with chronic pain in outpatient settings. He was not aware of whether the CDC Guidelines had been adopted by LARA, the Michigan Board of Medicine, the Michigan Board of Osteopathic Medicine and Surgery, the American Pain Society, the American Academy of Pain Medicine, the American Society of Anesthesiologists, or the Federation of State Medical Boards. Moreover, Dr. Cooke agreed that one of the recommendations

in the CDC Guidelines was that a primary care physician consult with a pain management specialist before prescribing controlled substances exceeding 90 MED.

Dr. Cooke indicated that, generally, prescribers should be cautious about escalating to higher doses of opioids because increased doses placed patients at higher risk, and that a physician should avoid co-prescribing benzodiazepines with opioids and other respiratory depressants. He testified that the CDC Guidelines indicated that a doctor should rarely prescribe amounts exceeding 90 morphine equivalent dosing (MED), and should do so only after careful consideration and documentation of the reasons. He explained that a physician must carefully consider and document the risks and benefits of and the patient's response to the medications. He further explained that studies had shown a clear relationship between opioid risk and death, and relationships between use of multiple respiratory suppressants and death. He also stated, "The risk to the patient is much higher when a patient is taking both a benzodiazepine and an opioid in combination. They both depress the drive to breathe. When you start adding in higher doses of multiple drugs from each class . . . the risk goes up exponentially." He clarified that the "[r]isk of death increases as MED increases as well as the number and doses of other respiratory depressants such as Xanax, Soma, and others are added in. They all progressively increase risk and that is true whether the patient is tolerant or not."

Dr. Cooke opined that respondent did not meet the applicable standard of care for prescribing pain medication. More specifically, he found some of respondent's initial and subsequent evaluations of the nine patients insufficient, and he did not see evidence of comprehensive treatment plans. Moreover, he opined that respondent prescribed opioids in very high and potentially fatal doses above the recommended limits in the CDC Guidelines, and failed to properly document the rationale for the prescriptions. Also, he expressed concern about the combination of drugs that respondent was prescribing or that his patients were otherwise taking, noting that nearly all the subject patients were receiving at least three different controlled substances and, in some cases, five or six different prescriptions. He was concerned that there was no documentation showing that respondent and the patient recognized the risks of combining the prescribed medications. However, Dr. Cooke also observed that between 2015 and June 2017, there was a "substantial decrease" in the amount of benzodiazepine and carisoprodol prescriptions issued by respondent. He further noted that, in several cases, he did not see evidence that the patients had improved in a meaningful way but medications were being continued or escalated. Dr. Cooke testified that he would have expected to see documented reasons for changing medications when that occurred. Also, he noted that several patients had instances where drug screen results were not consistent with what had been prescribed or showed the presence of illicit drugs.

Respondent's expert, Thomas S. Nabity Jr., M.D., had practiced pain medicine and physical medicine rehabilitation since 2006 and was board-certified in Physical Medicine and Rehabilitation and in the subspecialty of pain medicine. He worked for the Michigan Neurology Association where about 90% of his patients had pain complaints. He testified that he was familiar with the medical literature and research in the treatment and care of patients with chronic pain, and explained that in treating a chronic pain patient, a physician had to consider how to combat a patient's pain while taking into consideration issues of misuse and addiction. According to Dr. Nabity, this process included identifying patients that had painful disorders, whether through trauma or occurring over time, identifying a diagnosis, working through the risks and benefits of

the prescription for the patient, and incorporating drug therapy into a comprehensive plan that looked at behavior therapy, interventional pain, procedures, nonopiate alternate pain medication, and lifestyle changes. Dr. Nabity noted that because of the subjective nature of pain, physicians had little evidence to guide them about dosing strategies for prescribing opioids for chronic pain therapy.

Dr. Nabity was familiar with different recommendations as to limiting dosages, such as those identified by the American Society of Interventional Pain Physicians (ASIPP), the American Pain Society, the CDC Guidelines, and different insurance companies. He indicated that ASIPP's recommendation of 300 MED was the highest ceiling, while the CDC Guidelines' recommendation of 90 MED was the lowest ceiling. However, he indicated that there was disagreement about the importance or validity of the MED standard, and he opined that the standard of care for treating chronic pain did not have a high dose limit. He indicated that when he first began practicing medicine, the standard was that opiates were the last line of treatment and that one would start with low doses and titrate upward to pain control, but over time there had been a change in the standard of care with regard to MED levels, and continuing to escalate dosages of opiates until pain relief was achieved was no longer the standard of care. He claimed that the absolute MED limit was still being debated. He also opined that the standard of care allowed use of benzodiazepines on a long-term basis in chronic pain patients.

Dr. Nabity suggested that the CDC Guidelines and the standard of care were not the same thing; the CDC Guidelines were merely recommendations based on a review of a large number of patients in large numbers of situations, whereas the standard of care was an acceptable practice regarding how *an individual* was treated and managed. He noted that the CDC Guidelines were a voluntary recommendation rather than a prescriptive standard, and intended for primary care physicians. He suggested that the CDC Guidelines were merely a guide for the change in prescribing practices.

According to Dr. Nabity, respondent's treatment for each of the nine patients and his documentation in the patient charts fell within the standard of care applicable during the time of care. He described the nine patients as "very complicated cases," all involving chronic pain, and stated that all but one of the patients had suffered traumatic injuries. He noted that the patients had a history of multiple surgeries, and that chronic pain patients often also experienced anxiety and depression. He further noted that the patient records contained lab tests, drug screens, diagnostic imaging, neuropsychological exams, and referrals to various specialists. He opined that this information suggested that respondent was following a comprehensive treatment plan, including a full exploration of available treatment options, and was not simply prescribing medications to his patients. Dr. Nabity also noted that respondent regularly checked reports from MAPS before patients were started on opiates.

Dr. Nabity also testified that respondent's controlled-substance agreement form contained informed consent information discussing that his treatments were done to assist in pain control, that there were risks associated with treatment, and that the patient was required to comply with certain expectations to maintain their pain medication prescriptions. He opined that this was sufficient evidence to support a conclusion that the patients were aware of potential risks. In his opinion, there was no evidence presented that any of respondent's patients had experienced respiratory depression or overdose, and there was evidence that only one patient showed addictive

behavior, which respondent addressed by terminating care. Dr. Nabity further noted that within the previous year, respondent had worked to bring prescription levels down, and had also sought additional consultations to assist individual patients. Dr. Nabity opined that it was reasonable for respondent to make changes to medications after considering the patients' conditions; he stated that finding a balance that worked for each patient was more important than the level of morphine equivalent dosing prescribed.

Dr. Nabity testified that a pain management physician should stop prescribing controlled substances based on inconsistencies in drug screen results when the provider believes that the harm outweighs the benefit derived from the prescription. Moreover, he indicated that when a drug screen identifies an illicit drug, a discussion should take place about the propriety of the patient's referral to a substance abuse specialist.

Based on his review of the medical records, Dr. Nabity opined that respondent met the minimal standards of care. Dr. Nabity disagreed with Dr. Cooke's suggestion that respondent's initial history taking for the patients was deficient and Dr. Cooke's assessment that the records lacked clinical rationales and decisions. He opined that the charting was sufficient to assess whether the patients had received functional benefit from controlled substances. He also noted that respondent had recommended neuropsychological and surgical consults when appropriate.

Following the hearings, the administrative law judge (ALJ) issued his proposal for decision, concluding that respondent was subject to discipline under MCL 333.16221(a) (negligence or failure to exercise due care), MCL 333.16221(b)(*i*) (incompetence), MCL 333.16221(b)(*vi*) (lack of good moral character), and MCL 333.16221(c)(*iv*) (prescribing or administering drugs for other than lawful diagnostic or therapeutic purposes). The ALJ made specific findings of fact with respect to each of the nine patients. With regard to the standard of care, the ALJ recognized the differing expert opinions, but stated, "The CDC Guideline and the underlying studies reference [sic] therein reflect the standard of care for a pain management doctor during the same time periods relevant to this case." The ALJ found that respondent had "made significant changes in his prescribing practices starting in September 2016 through September 2017, during which time he wrote fewer prescriptions for controlled substances and reduced dosages for some patients." The ALJ specifically determined that respondent violated MCL 333.16221(a) and (b)(*i*), but not solely for writing prescriptions that exceeded 90 or 120 MEDs; rather, it was for failing to document his underlying rationale for exceeding those thresholds and for writing combination prescriptions. The ALJ noted that all nine patients had also been prescribed a benzodiazepine along with the opioids, and none of the medical records included documentation about the inherent risk of this combination. According to the ALJ, this "strongly supports" a conclusion that respondent violated the standard of care requiring documented reasoning for both prescribing chronic opioid therapy in high doses, along with benzodiazepines, and in some cases multiple other controlled substances. The ALJ noted that as of 2010, and certainly after March 2016, the literature was well-established regarding the dangers of MEDs greater than 120, with or without other controlled substances.

The ALJ further concluded that "the totality of the evidence" supported a finding that respondent lacked good moral character because he ranked in the top 30 prescribers statewide for several commonly abused and diverted controlled substances while only working 25 to 30 hours per week. And, in 2015, respondent wrote an average of approximately 200 controlled substance

prescriptions each week. The ALJ noted that respondent prescribed opioids and benzodiazepines for a relative without assessing him for substance abuse, reviewing his MAPS reports, or administering urine drug screens, and injected him with testosterone without testing to determine a need for the treatment. Finally, the ALJ concluded that the high doses of opioids with benzodiazepines and other dangerous combinations of drugs were not for legitimate therapeutic purposes. This conclusion was based on respondent's persistent disregard for the risks inherent in his prescribing practices, and the lack of documentation regarding those risks or their disclosure to his patients.

The Disciplinary Subcommittee entered a final order adopting the ALJ's proposal for decision. In addition to suspending respondent's medical license for three years for violating MCL 333.16221(a), (b)(*i*), (b)(*vi*), and (c)(*iv*), the Subcommittee required that respondent apply for reinstatement of his license and pay a $25,000 fine before doing so. This appeal followed.

## II. STANDARD OF REVIEW

This Court reviews a final order in a disciplinary case under the Public Health Code as follows:

> All final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record. [*Dep't of Community Health v Risch*, 274 Mich App 365, 371; 733 NW2d 403 (2007), quoting Const 1963, art 6, § 28.]

"When reviewing whether an agency's decision was supported by competent, material, and substantial evidence on the whole record, a court must review the entire record and not just the portions supporting the agency's findings." *Risch*, 274 Mich App at 372. Evidence is substantial if a reasonable mind would accept it as "sufficient to support a conclusion." *Id*. Substantial evidence requires "more than a scintilla of evidence," but "may be substantially less than a preponderance." *Id*. (quotation marks and citation omitted). However, this Court generally will not disturb administrative findings of fact, especially when they are based on credibility determinations, "because it is not the function of a reviewing court to assess witness credibility or resolve conflicts of evidence." *Id*. Indeed, this Court "may not set aside factual findings supported by the evidence merely because alternative findings could have been supported by evidence on the record . . . ." *Id*. at 373. "Moreover, an appellate court must generally defer to an agency's administrative expertise." *Dep't of Community Health v Anderson*, 299 Mich App 591, 598; 830 NW2d 814 (2013).

## III. ANALYSIS

Respondent first argues that the Disciplinary Subcommittee's final order should be reversed because absent any expert testimony or evidence as to "the actual, relevant and applicable

standard of care and how that standard was breached, there was no competent, material, and substantial evidence on which the Disciplinary Subcommittee could have ruled that [respondent] violated the Public Health Code in any way." The crux of respondent's argument is that the 2016 CDC Guidelines and other literature cited by Dr. Cooke as the applicable standard of care apply to primary care physicians and not chronic pain management practitioners like respondent. This argument is unavailing.

We first note that the 2016 Guidelines were not admitted at any time during these proceedings. Nonetheless, neither party disputes that they are intended for primary care physicians. The issue at hand, therefore, is whether they also apply to pain management physicians with respect to the prescribing of pain medication.

All information relevant to the 2016 Guidelines was presented via testimony. Dr. Cooke indicated that they were not the first or only recommendation, but were the most recent. He further indicated that the CDC Guidelines memorialized what had been the standard of care for prescribing controlled substances for at least the previous five years, and that the principles underlying the CDC Guidelines had also been previously published in leading medical journals. Moreover, Dr. Cooke recognized that although other guidelines existed, it was clear that prescribers should be cautious about escalating to higher doses of opioids because increased doses placed patients at higher risk, and that a physician should avoid prescribing both benzodiazepines and opioids or other respiratory depressants. Dr. Cooke testified that the CDC Guidelines indicated that a doctor should rarely prescribe amounts exceeding 90 MED, and should do so only after careful consideration and documentation of the reasons. He also explained that a physician must carefully consider and document the risks, benefits, and patient's response to medications. Additionally, throughout these proceedings, pharmacy specialist Waldmiller testified that the CDC Guidelines served as a guide when she reviewed prescribing practices of physicians. The combined testimony of Dr. Cooke and Waldmiller supports a conclusion that the CDC Guidelines were the accepted standard of care regarding prescribing pain medication at the relevant time.

On the other hand, Dr. Nabity testified that he was aware of the 2016 CDC Guidelines and the industry's evolution toward caps on pain medication. Nonetheless, he suggested that the 2016 Guidelines were not in place during respondent's treatment of the nine patients whose records he reviewed. He described a standard of care that followed very loose guidelines and allowed virtually unlimited doses of pain relief as well as drug combinations.

The ALJ recognized the differing expert opinions, but stated, "The CDC Guideline and the underlying studies reference [sic] therein reflect the standard of care for a pain management doctor during the same time periods relevant to this case." This conclusion indicated that the ALJ found Dr. Cooke's and Waldmiller's testimony credible in terms of what was applicable during the relevant time frame. As noted above, this Court generally will not disturb administrative findings when they are based on credibility determinations "because it is not the function of a reviewing court to assess witness credibility or resolve conflicts of evidence." *Risch*, 274 Mich App at 372.

Our review of the ALJ's determination reflects that the ALJ's analysis was consistent with the use of the CDC Guidelines as a benchmark to evaluate respondent's conduct. Following his review of the record and testimony, the ALJ determined that respondent did not adequately justify concurrent prescriptions, did not adequately address the risk of abuse or diversion with patients,

and failed to justify the high level of medications prescribed. Those conclusions are supported by Dr. Cooke's testimony. Moreover, a disciplinary subcommittee may rely on its own expertise in determining violations of the Public Health Code. *Anderson*, 299 Mich App at 600. In that regard, this Court has previously concluded that a disciplinary subcommittee does not require expert testimony to determine that a respondent was negligent or lacking in good moral character when the conduct lacked basic elements of professional integrity. *Sillery v Bd of Med*, 145 Mich App 681, 688-689; 378 NW2d (1985). Therefore, even without Dr. Cooke's testimony, the Board could have determined, using its own expertise, that the evidence demonstrated that respondent engaged in violations of the Public Health Code. The Board's decision was supported by competent, material, and substantial evidence on the record.

Respondent argues that the final order is not supported by competent, material, and substantial evidence to establish that he violated MCL 333.16221(a) or (b)(*i*) through negligence and incompetency because the record amply supports that respondent exercised due care in treating his patients and in documenting the course of their care. We disagree.

MCL 333.16221(a) provides:

(a) Except as otherwise specifically provided in this section, a violation of general duty, consisting of negligence or failure to exercise due care, including negligent delegation to or supervision of employees or other individuals, whether or not injury results, or any conduct, practice, or condition that impairs, or may impair, the ability to safely and skillfully engage in the practice of the health profession.

"Negligence is a well-recognized legal concept which describes conduct that falls below a standard of reasonable or due care. A failure to exercise due care contemplates an abdication of responsibilities or carelessness in executing one's duties." *Sillery*, 145 Mich App at 686. Further, MCL 333.16221(b)(*i*) authorizes disciplinary action for incompetence. Incompetence is defined as "a departure from, or failure to conform to, minimal standards of acceptable and prevailing practice for a health profession, whether or not actual injury to an individual occurs." MCL 333.16106(1).

The crux of respondent's argument is that the standard of care adopted by the ALJ was incorrect. With that pretext, respondent argues that Dr. Nabity's testimony about the ways in which respondent met the standard of care was sufficient to establish that respondent was not negligent or incompetent. However, as noted above, this Court defers to the ALJ's credibility determination. Furthermore, Dr. Cooke presented significant testimony regarding various concerns regarding respondent's failure to adequately justify concurrent prescriptions, to address the risk of abuse or diversion with patients, and to justify changes and high levels of medications prescribed. Dr. Cooke's testimony, coupled with the ALJ's own conclusions, establish that sufficient competent evidence was presented to establish that respondent violated MCL 333.16221(a) and (b)(*i*), so as to support the Subcommittee's final order.

Respondent further argues that the final order is not based on sufficient competent evidence to establish that he lacked good moral character, thereby violating MCL 333.16221(b)(*vi*). "Good moral character" means "the propensity on the part of the person to serve the public in the licensed

area in a fair, honest, and open manner." MCL 338.41(1). Respondent asserts that the ALJ's conclusion that he lacked good moral character was based only on statistical data that respondent ranked in the top 30 prescribers statewide for several commonly abused and diverted controlled substances. Respondent asserts that this data does not support the ALJ's conclusion because a pain management physician would be more likely than other providers to prescribe controlled substances and treat a population with significant medical conditions. However, this argument ignores the ALJ's conclusion that respondent demonstrated a lack of good moral character when he prescribed opioids and benzodiazepines to his relative without assessing for substance abuse, reviewing MAPS, or administering drug screens. Further, the ALJ noted that respondent injected his relative with testosterone without testing to determine the need for the injection, and continued to prescribe medications to patients despite numerous inconsistent urine drug screen results showing the medications were not being taken. The ALJ concluded that respondent "demonstrate[d] a pattern of prescribing practices, lack of documentation, and a disregard for the significant risks to his patients" that demonstrated a lack of openness and honesty. Given the ALJ's multiple reasons for concluding that respondent lacked good moral character, and the support in the medical records for these reasons, we hold that the ALJ's conclusion was supported by sufficient competent evidence.

Lastly, respondent argues that competent, material, and substantial evidence did not establish that respondent violated MCL 333.16221(c)(*iv*). MCL 333.16221(c)(*iv*) identifies violations of the Public Health Code that include "selling, prescribing, giving away, or administering drugs for other than lawful diagnostic or therapeutic purposes." Respondent argues that there is no proof that he acted for some illicit purpose beyond treating his patients. We disagree.

Once again, the crux of respondent's argument is that a violation of an incorrect standard of care is insufficient to establish a violation of the Public Health Code. However, as noted above, the ALJ did not err by adopting the 2016 CDC Guidelines as the relevant standard of care. Nonetheless, while it was indeed undisputed by both experts that the patients at issue had severe, chronic pain, there was significant testimony presented by Dr. Cooke regarding the frequency at which respondent prescribed medications without a documented discussion regarding the associated risks and benefits. In that regard, the record supports a conclusion that respondent frequently prescribed a high level of substances without documenting any justification, and on some occasions without any prior testing to confirm the need for the medications. Additionally, on several occasions respondent continued to prescribe these substances despite receiving drug screen results that were inconsistent for the medications prescribed, and prescribed medications to a relative without reviewing MAPS or requiring drug screens. These acts were sufficient to establish a violation of the relevant standard of care.

In sum, we conclude that when viewed as a whole, the record before this Court contains sufficient competent, material, and substantial evidence to support the ALJ's and the Disciplinary Subcommittee's ruling that respondent was negligent, was incompetent, lacked a good moral character, and dispensed medications for other than legitimate or therapeutic purposes.

Affirmed.

/s/ Jane E. Markey
/s/ Patrick M. Meter
/s/ Michael F. Gadola